## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**RIXEY M. MARTINEZ,**

             **Plaintiff,**

**v.**                                                    **No. CIV-15-645 LAM**

**CAROLYN W. COLVIN, Acting Commissioner**
**of the Social Security Administration,**

             **Defendant.**

## <u>MEMORANDUM OPINION AND ORDER</u>

THIS MATTER is before the Court on Plaintiff's ***Motion to Reverse and Remand for a Rehearing With Supporting Memorandum*** (*Doc. 18*), filed March 30, 2016 (hereinafter "motion").   On August 18, 2016, Defendant filed a response (*Doc. 24*) to Plaintiff's motion and, on September 13, 2016, Plaintiff filed a reply (*Doc. 28*).   In accordance with 28 U.S.C. § 636(c)(1)  and  Fed. R. Civ. P. 73(b),  the parties have consented to have the undersigned United States Magistrate Judge conduct all proceedings and enter a final judgment in this case.   *See*  [*Docs.* 5 and 9].   The Court has considered Plaintiff's motion, Defendant's response, Plaintiff's reply, and the relevant law.   Additionally, the Court has meticulously reviewed and considered the entire administrative record.   [*Doc. 13*].   For the reasons set forth below, the Court **FINDS** that Plaintiff's motion should be **GRANTED** and the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") should be **REMANDED**.

             .

# I.   Procedural History

On February 13, 2012 (*Doc. 13-9* at 4), Plaintiff protectively filed an application for Disability Insurance Benefits (hereinafter "DBI"), alleging disability that began on January 10, 2012 (*id*.), and that his disability was due to heart attack, back problems, high blood pressure, asthma, and coronary artery stent (*id*. at 8).   Plaintiff's application was denied at the initial level on August 14, 2012 (*Doc. 13-5* at 2), and at the reconsideration level on June 12, 2013 (*id*. at 3). Plaintiff requested a hearing to review the denial of his application (*Doc. 13-6* at 27), and Administrative Law Judge Michael S. Hertzig (hereinafter "ALJ") conducted a hearing on March 31, 2014 (*Doc. 13-3* at 24-70) (hereinafter "March Hearing").   Plaintiff appeared by phone at the March Hearing, represented by his current counsel, and testified (*id*. at 26, 35-67), as did Vocational Expert Mary Diane Weber[1] (hereinafter "VE Weber") (*id*. at 68-70).   The ALJ conducted a second hearing on December 2, 2014.   [*Doc. 13-4* at 2-18] (hereinafter "December Hearing").   Plaintiff had been excused from attending the December Hearing by the ALJ, and did not personally appear, but was represented there by his attorney.   *Id*. at 4.   Psychological expert Jack E. Bentham, Ph.D. testified at the December Hearing (*id*. at 6-11), as did Vocational Expert Sandra Trost[2] (hereinafter "VE Trost") (*id*. at 11-17).

---

[1] Although the March Hearing transcript identifies the VE as "Mary Webber (phonetic)" (*Doc. 13-3* at 24), the VE's resume identifies her as "Mary Diane Weber" (*Doc. 13-7* at 8-9).

[2] Although the December Hearing transcript identifies the VE as "Ms. Chost (phonetic)" (*Doc. 13-4* at 2), the VE's resume identifies her as "Sandra M. Trost" (*Doc. 13-7* at 37-38).

On January 15, 2015, the ALJ issued a decision (*Doc. 13-3* at 16-23) finding that, under the relevant sections of the Social Security Act, Plaintiff "was not disabled prior to February 6, 2013 . . . but became disabled on that date and has continued to be disabled through the date of this decision" (*id*. at 23).   On February 6, 2015, Plaintiff requested that the Appeals Council review the ALJ's decision.   *Id*. at 11.   On May 22, 2015, the Appeals Council denied Plaintiff's request for review on the ground that there was "no reason under our rules to review the [ALJ]'s decision." *Id*. at 2.   This decision was the final decision of the Commissioner.   On July 24, 2015, Plaintiff filed his complaint in this case.   [*Doc. 1*].

## II.   Standard of Review

The standard of review in a Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether the correct legal standards were applied. *Maes v. Astrue*,   522 F.3d 1093, 1096   (10th Cir. 2008)   (citing   *Hamilton v. Sec'y of Health & Human Servs.*,   961 F.2d 1495, 1497–98   (10th Cir. 1992)).   If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands, and the plaintiff is not entitled to relief.   *See Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003).   A court should meticulously review the entire record but should neither re-weigh the evidence nor substitute its judgment for that of the Commissioner.   *Hamlin*, 365 F.3d at 1214; *Langley*, 373 F.3d at 1118.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   *Langley*, 373 F.3d at 1118 (citation and quotation marks omitted); *Hamlin*,  365 F.3d  at 1214 (citation and  quotation  marks  omitted); *Doyal*, 331 F.3d

at 760 (citation and quotation marks omitted).   An ALJ's decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it."   *Langley*, 373 F.3d at 1118 (citation and quotation marks omitted); *Hamlin*, 365 F.3d at 1214 (citation and quotation marks omitted).   While a court may not re-weigh the evidence or try the issues *de novo*, its examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met."   *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005) (citations omitted).   "The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ]'s findings from being supported by substantial evidence."   *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (citing *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

## III.   Applicable Law and Sequential Evaluation Process

For purposes of DIB, a person establishes a disability when he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.905(a).   In light of this definition for disability, a five-step sequential evaluation process (hereinafter "SEP") has been established for evaluating a disability claim. 20 C.F.R. § 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).   At the first four steps of the SEP, the claimant has the burden to show that: (1) the claimant is not engaged in "substantial gainful activity;" and (2) the claimant has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; and either

(3) the claimant's impairment(s) meet(s) or equal(s) one of the "Listings" of presumptively disabling impairments; or (4) the claimant is unable to perform his or her "past relevant work." 20 C.F.R. § 404.1520(a)(4)(i–iv); *Grogan*, 399 F.3d at 1261.   At the fifth step of the evaluation process, the burden of proof shifts to the Commissioner to show that the claimant is able to perform other work in the national economy, considering his or her residual functional capacity (hereinafter "RFC"), age, education, and work experience.   *Grogan*, 399 F.3d at 1261.

## IV.   Plaintiff's Age, Education, Work Experience,and Medical History; and the ALJ's Decision

Plaintiff was born on July 14, 1948 (*Doc. 13-3* at 35), and was 63 years old on January 10, 2012, the alleged date of disability onset (*Doc. 13-9* at 4).   Thus, for the purposes of his disability claim, Plaintiff is considered to be a person "closely approaching retirement age."[3]   Plaintiff is an Army veteran, and he obtained a GED while he was in the service.   [*Doc. 13-3* at 35].   He reads and understands English.   [*Doc. 13-9* at 7].   He has worked as a city laborer, a safety technician and an inventory clerk in the oil and gas field, as a safety technician in the construction field, and a service writer at an auto dealership (*Doc. 13-3* at 69-70), but stopped working on January 8, 2010, due to his health conditions (*Doc. 13-9* at 8).

Plaintiff's medical records include: Treatment records from the Veteran's Administration dated October 17, 2012 to February 6, 2013 (*Doc. 13-16* at 13-30); Medical Assessment of Ability to do Work-Related Activities (Mental), dated March 6, 2014, from Laura Cruz-Hinson, M.D.

---

[3] *See* 20 C.F.R. § 416.963(e) (defining "closely approaching retirement age" as "age 60 or older").

(*Doc. 13-17* at 3-6); Medical Assessment of Ability to do Work-Related Activities (Physical) and (Non-Physical), dated March 14, 2014, from Marlene Bynum, M.D. (*id*. at 8-9); and Medical records from the Department of Veterans Affairs, for the period from January 2, 2013 through March 14, 2014 (*id*. at 15-51).[4]   Where relevant, Plaintiff's medical records are discussed in more detail below.

At step one of the five-step evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the date he claimed his disability began.   [*Doc. 13-3* at 18].   At step two, the ALJ found that Plaintiff has had the following severe impairments since January 10, 2012, which is the alleged disability onset date:   "Hypertension, ischemic heart disease, and asthma."   *Id*.   The ALJ also found that, since February 6, 2013, Plaintiff has had additional severe impairments of post-traumatic stress disorder ("PTSD") and "an affective disorder."   *Id*.   At the third step, the ALJ found that "[p]rior to February 6, 2013," Plaintiff "did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)."   *Id*. at 19.   In so finding, the ALJ considered cardiovascular, skin, endocrine system, and mental disorder listing categories.   *Id*. (citing Listing categories 4.00, 8.00, 9.00, and 12.00).   Prior to step four, the ALJ determined that, for the period from January 10, 2012 to February 6, 2013, Plaintiff had the RFC, to:

---

[4] These records primarily relate to Plaintiff's mental impairments, which are the subject of his appeal to this Court.   The administrative record also includes voluminous records regarding Plaintiff's physical impairments, which are not listed here.

> perform medium work as defined in 20 CFR 404.1567(c) except he can lift and/or carry fifty pounds occasionally and twenty-five pounds frequently; stand and/or walk for six hours in an eight hour day; sit for six hours in an eight hour day; frequently climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds; and frequently stoop. However, [Plaintiff] must avoid even moderate exposure to extreme cold, avoid concentrated exposure to noise, and avoid even moderate exposure to fumes, odors, dust, gases, poor ventilation and the like.

*Id.* In support of this RFC assessment, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Plaintiff]'s statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible prior to February 6, 2013, for the reasons explained in this decision." *Id.* at 21.

At step four, the ALJ found that Plaintiff "has been unable to perform any past relevant work" since January 10, 2012, because the demands of Plaintiff's previous work exceed his current RFC. *Id.* At step five, the ALJ found that, prior to February 6, 2013, jobs existed in significant numbers in the national economy that Plaintiff could have performed. *Id.* at 22. The ALJ indicated that, "if [Plaintiff] had the [RFC] to perform the full range of medium work, a finding of 'not disabled' would be directed by Medical-Vocational Rule 203.07," but that Plaintiff's ability to perform medium work "was impeded by additional limitations." *Id.* Therefore, the ALJ relied on VE Trost's[5] testimony that an individual with Plaintiff's work history, education, and RFC could have performed the following representative jobs: dining

---

[5] At the March Hearing, the ALJ asked VE Weber to categorize Plaintiff's previous work under the Dictionary of Occupational Titles ("DOT"), which she did. [*Doc. 13-3* at 68-70]. However, the ALJ did not ask VE Weber to identify any jobs in the national economy that could be performed by someone of Plaintiff's age, and with his education, work experience, and RFC.

attendant (DOT 311.677-018), hand packer (DOT 920.587-018), warehouse worker (DOT 922.687-058), kitchen helper (DOT 318.687-010). and retail bagger/courtesy clerk (DOT 920.687-014).   [*Doc. 13-3* at 22; *Doc. 13-4* at 14-15].   Based on that testimony, the ALJ concluded that a finding of "not disabled" was appropriate for the period prior to February 6, 2013. [*Doc. 13-3* at 22-23].   However, the ALJ next found that "[b]eginning on February 6, 2013, the severity of [Plaintiff]'s impairments has met the criteria of [Listing] 12.06."   *Id*. at 23.   The ALJ concluded that, although Plaintiff was not disabled prior to February 6, 2013, he "became disabled on that date and has continued to be disabled through the date of the decision."   *Id*.

## V.   Analysis

In his motion, Plaintiff argues that the ALJ:   (1) did not provide a legitimate medical basis for the February 6, 2013 disability onset date (*Doc. 18* at 2); and (2) impermissibly ignored the sworn statement of Wanda Morgan, Plaintiff's sister (*id*.).   Defendant responds that the medical records were sufficient to determine a valid date of Plaintiff's onset of disability (*Doc. 24* at 9); and (2) it was unnecessary for the ALJ to "specifically discuss" the sworn statement, which was "offered nearly a year and a half after the date the ALJ found Plaintiff disabled," because the limitations it described had already been rejected (*id*. at 11).   In reply, Plaintiff argues that the ALJ's determination that his anxiety from PTSD met Listing 12.06 as of February 2013 fails to discuss record evidence to the contrary, particularly the medical records of Marlene G. Bynum, M.D., his primary care physician.   [*Doc. 28*].

## A.   The ALJ's Determination of Onset

Plaintiff challenges the ALJ's determination of the date upon which Plaintiff became disabled by an "Anxiety Disorder," as set forth in Listing 12.06. [*Doc. 18* at 10-15]. Initially, Plaintiff claimed to have only physical impairments that caused him to become disabled on January 10, 2012. [*Doc. 13-9* at 8]. However, based on medical assessments, Plaintiff later added "major depressive disorder, anxiety, and post-traumatic stress disorder" to his disability claim. [*Doc. 13-10* at 23]. The ALJ found that Plaintiff's physical impairments, while severe, were not disabling. [*Doc. 13-3* at 22-23]. The ALJ also found that, beginning on February 6, 2013, Plaintiff had additional severe impairments of "PTSD[] and an affective disorder."[6] *Id.* at 18. Finally, the ALJ found that Plaintiff's "impairments" met the criteria for Listing 12.06, as of the same date. *Id*. at 23. This Court's task is to determine whether the ALJ's finding that Plaintiff's mental and or physical impairments became disabling on February 6, 2013 is "supported by substantial evidence in the record." *See Langley*, 373 F.3d at 1118 (citation omitted).

On October 17, 2012, Plaintiff reported to Marlene G. Bynum, M.D., his primary health care provider, that he'd been "doing ok except for depressed x 3 months." [*Doc. 13-16* at 26]. Dr. Bynum reported that Plaintiff "decline[d] psyc[hiatric] referral," and started him on a trial of

_____

[6] "Affective disorders are a set of psychiatric diseases, also called mood disorders. The main types of affective disorders are depression, bipolar disorder, and anxiety disorder." http://www.healthline.com/health/affective-disorders (site last visited January 4, 2017). Although the ALJ found that Plaintiff has a severe "affective disorder," he did not consider whether that disorder met the criteria for Listing 12.04, nor did he attempt to determine its onset date.

sertraline, [7] an antidepressant medication.  *Id*. at 27.   During a follow-up phone call on November 19, 2012, Plaintiff reported "mood is much improved but having diarrhea every [morning]."  *Id*. at 23.   Dr. Bynum changed Plaintiff's medication from sertraline to Wellbutrin[8] and referred him to psychiatrist Laura L. Cruz-Hinson, M.D. for further evaluation.  *Id*.   Plaintiff was first seen and evaluated by Dr. Cruz-Hinson on February 6, 2013.  *Id*. at 15-21.   During her initial evaluation, Dr. Cruz-Hinson noted that Plaintiff reported that "he has been feeling depressed for a while," that he had divorced three years previously, and had moved in with his sister "after selling the house and settling the property," but was "feeling the strain of being there."  *Id*. at 15. Plaintiff also revealed that he had been "laid [] off from work so he lost his truck and has very little now," making him feel "like he lost everything."  *Id*.   Plaintiff also reported that he had suffered a heart attack and undergone a stent placement in January 2012, and that he spent his time sitting on a bar stool watching television.  *Id*.   Plaintiff further reported that he had left a suicide note for his family in 2010, which his sister had found "before he acted."  *Id*. at 16.   After Plaintiff's mother spoke with him about the note, he did not attempt suicide.  *Id*.   Dr. Cruz-Hinson also noted that Plaintiff had been "harassed by AA 'TOP' [Sergeant] in Fort Carson, Colorado for a

---

[7] Sertraline is the generic name for Zoloft, which is used to treat depression and several other mental disorders.   http://www.mayoclinic.org/drugs-supplements/sertraline-oral-route/description/drg-20065940 (site last visited January 4, 2017).

[8] Wellbutrin is one of several brand names for bupropion, which is another drug used to treat depression.  http://www.mayoclinic.org/drugs-supplements/bupropion-oral-route/description/drg-20062478 (site last visited January 4, 2017).

year,"[9] and had suffered "childhood trauma," which she described as "father very abusive to mother, father tried to strangle [Plaintiff] several times growing up."   *Id*. at 16, 18.   As part of her evaluation, Dr. Cruz-Hinson diagnosed Plaintiff with both Major Depressive Disorder and "PTSD military/childhood," and assigned him a GAF score of 49.[10]   *Id*. at 20.

"The onset date of disability is the first day an individual is *disabled* as defined in the Act and the regulations."   Soc. Sec. Rep. 83-20, at*1 (emphasis added).   Where a disability is of traumatic origin, the date of onset is the date of the traumatic injury."   *Blea v. Barnhart*, 466 F.3d 903, 909 (10th Cir. 2006) (citing SSR 83-20 at *2).   However, where disabilities are not the result of traumatic injury, the date of onset is more complicated, and "it is sometimes impossible to obtain medical evidence establishing the precise date [a non-traumatic] impairment became disabling."   SSR 83-20 at 2.   Unlike traumatic impairments, non-traumatic impairments do not typically become disabling on the date on which the claimant first experiences symptoms.

---

[9]   Plaintiff served in the Army from 1968 to 1970.   [*Doc. 13-3* at 35-36].

[10]   In determining that the date of Dr. Cruz-Hinson's initial evaluation was a "good date" for onset, the ALJ and the medical consultant appeared to consider Plaintiff's GAF score.   *See* [*Doc. 13-4* at 10].   The GAF, or Global Assessment of Functioning, is a 100-point scale that is intended to reflect a clinician's judgment of an individual's psychological, social, and occupational functioning.   *Langley*, 373 F.3d at 1122 n.3.   A score in the range from 41-50 is said to indicate "[s]erious symptoms" such as "suicidal ideation, severe obsessional rituals, [or] frequent shoplifting," or "serious impairment in social occupational or school functioning (*e.g*., no friends, unable to keep a job)."   DSM-IV-TR at 34.   However, "[t]he most recent edition of the DSM omits the GAF scale" for reasons that include "its conceptual lack of clarity . . . and questionable psychometrics in routine practice."   *Richards v. Colvin*, 640 F. App'x 786, 791 (10th Cir. Feb. 12, 2016) (unpublished).   In rejecting the plaintiff's argument that her GAF scores were "significantly probative evidence," the *Richards* court also relied on the doctors' failure in that case to "explain[] how they calculated the [GAF] scores or linked them to any particular symptoms."   *Id*.   Realistically, a single GAF score cannot provide a basis for onset of a mental disability, as it is essentially only "a snapshot" of a patient's functioning at a particular point in time.   *See, e.g., Covington v. Colvin*, 2015 WL 471641, at *4 (D. Utah Feb. 4, 2015) (unpublished).   That is especially true where, as here, the GAF score was assigned based on the clinician's first interaction with the patient, and where the clinician did not specify her reasons for the assessed score.

Nonetheless, "[p]articularly in the case of slowly progressive impairments, it is not necessary for an impairment to have reached listing severity (*i.e.*, be decided on medical grounds alone) before onset can be established." *Id.* Thus, in cases of non-traumatic disability, "it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process." *Id.* Where it is reasonable to "infer that the onset of a disabling impairment[] occurred some time prior to the date of the first recorded medical examination," the determination of onset "depends on an informed judgment of the facts," which "must have a legitimate medical basis." *Id.* at *3. A "convincing rationale must be given for the date selected." *Id.* Thus, in *Blea*, 466 F.3d at 909 n.1, the Tenth Circuit held that SSR 83-20 "requires the assistance of a medical advisor whenever 'onset' must be inferred."[11]

In this case, the ALJ found that Plaintiff was not disabled "prior to February 6, 2013." [*Doc. 13-3* at 22-23]. In so finding, the ALJ focused principally on Plaintiff's physical impairments, but also found that Plaintiff's "alleged mental impairment [sic]" were "not severe, causing no more than mild limitations in functioning," prior to February 6, 2013. *Id.* at 21. However, the ALJ determined that, "[b]eginning on February 6, 2013, the severity of [Plaintiff]'s

---

[11] The parties argue in their briefs whether the onset date of Plaintiff's disability needed to be "inferred," thereby requiring the ALJ to obtain the assistance of a medical advisor (*See Doc.* 18 at 10-15 and *Doc.* 24 at 8-9). However, that is not really the issue in this case. While one of Plaintiff's mental impairments, PTSD, is associated with trauma, it is not necessarily immediately disabling, as is a physically traumatic injury, in which the onset date is the date of injury. *Blea*, 466 F.3d at 909. Indeed, the ALJ clearly considered Plaintiff's mental impairments to be non-traumatic in origin, both because he obtained a medical expert to advise him, and because he determined the onset date to be well after any traumatic incidents that may have given rise to those disorders.

impairments[12] has met the criteria of [Listing] 12.06.".  *Id*. at 23.  Listing 12.06, which details

the characteristics of presumptively-disabling "[a]nxiety and obsessive-compulsive disorders,"

requires proof of the criteria set forth either in paragraphs A and B, or in A and C, of that provision,

which are:

A. Medical documentation of the requirements of paragraph 1, 2, or 3:

> 1.  Anxiety disorder, characterized by three or more of the following;
>     a. Restlessness;
>     b. Easily fatigued;
>     c. Difficulty concentrating;
>     d. Irritability;
>     e. Muscle tension; or
>     f. Sleep disturbance.
>
> 2.  Panic disorder or agoraphobia, characterized by one or both:
>     a. Panic attacks followed by a persistent concern or worry about additional panic attacks or their consequences; or
>     b. Disproportionate fear or anxiety about at least two different situations (for example, using public transportation, being in a crowd, being in a line, being outside of your home, being in open spaces).
>
> 3.  Obsessive-compulsive disorder, characterized by one or both:
>     a. Involuntary, time-consuming preoccupation with intrusive, unwanted thoughts; or
>     b. Repetitive behaviors aimed at reducing anxiety.

AND

---

[12] Although the ALJ indicated that Plaintiff's *impairments* met the criteria of Listing 12.06 after February 6, 2013, only one of his impairments, PTSD, could possibly satisfy that listing.  Without an explanation in the decision, this Court cannot determine whether, after that date, the ALJ simply did not consider Plaintiff's other impairments, or considered those impairments, together, to be non-disabling.  In this case, a reasonable assumption is that the ALJ simply did not consider Plaintiff's other impairments once he determined Plaintiff's PTSD to be presumptively disabling.  However, at the very least, those other impairments should have been considered with respect to when Plaintiff's PTSD became disabling, since the combined impact of impairments is relevant to disability.  20 C.F.R. § 404.1520(c).

B. Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning (see 12.00F):

   1. Understand, remember, or apply information (see 12.00E1).

   2. Interact with others (see 12.00E2).

   3. Concentrate, persist, or maintain pace (see 12.00E3).

   4. Adapt or manage oneself (see 12.00E4).

OR

C. Your mental disorder in this listing category is "serious and persistent;" that is, you have a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both:

   1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder (see 12.00G2b); and

   2. Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life (see 12.00G2c).

20 C.F.R. Pt. 404, Subpt. P, App'x 1, ¶ 12.06.   Significantly, the ALJ's decision neither indicates how Plaintiff's mental impairments met the criteria of Listing 12.06, nor what medical evidence was considered in reaching that conclusion.   *See* [*Doc. 13-3* at 23].   An ALJ's failure "to adequately discuss the evidence and tie his conclusions to the evidence" with respect to listing severity is "based on legal error and must be reversed."   *Carpenter v. Astrue*, 537 F.3d 1264, 1270 (10th Cir. 2008).   Additionally, the ALJ's only statements in support of his finding that Plaintiff's mental impairments were non-severe prior to February 6, 2013, were that Plaintiff had not received "any mental health treatment" prior to that date, had "declined referral to a psychologist [sic] in October 2012," and was not on medication.   *Id*. at 18.   These statements,

14

which are cursory at best, are also inaccurate.   Dr. Bynum began treating Plaintiff's depression with medication in October 2012.   [*Doc. 13-16* at 27].

In March 2014, Dr. Bynum (*Doc. 13-17* at 3-4) filled out a mental assessment form that indicated Plaintiff had "marked" limitations in several work-related areas.[13]   However, the ALJ rejected Dr. Bynum's opinion for the period prior to February 6, 2013, on the grounds that it was "largely unpersuasive" and was "markedly inconsistent with the medical records corresponding to the same period of time, *which show no mental health treatment*."[14]   [*Doc. 13-3* at 21] (emphasis added).   However, the date a claimant is first treated for a mental impairment does not establish the severity of the impairment, since:

> the regulations set out exactly how an ALJ is to determine severity, and consideration of the amount of treatment received by a claimant does not play a role in that determination.   This is because the lack of treatment for an impairment does not necessarily mean that the impairment does not exist or impose functional limitations.   Further, attempting to require treatment as a precondition for disability would clearly undermine the use of consultative examinations.   Thus, the ALJ failed to follow the regulations in reaching [the] determination that [claimant]'s mental limitations were not severe at step two of the sequential evaluation.

*Grotendorst v. Astrue*, 370 F. App'x 879, 883 (10th Cir. March 22, 2010) (unpublished).

---

[13] Dr. Cruz-Hinson also assessed Plaintiff's mental impairments in March 2014, and indicated that they met both the Listing 12.04 criteria for "depressive syndrome," and three out of five "anxiety-related disorders" under Listing 12.06.   [*Doc. 13-17* at 5-6].   Although the ALJ acknowledged that Plaintiff was diagnosed and treated by Dr.  Cruz-Hinson (*Doc. 13-3* at 18, 23), his decision effectively contains no analysis of Dr. Cruz-Hinson's opinions whatsoever.

[14] Earlier in the opinion, the ALJ referred to Dr. Bynum's assessment as "[t]he check-box medical source statement signed by [Plaintiff]'s treating physician," indicating that it was "obviously strongly influenced by [Plaintiff]'s mental health treatment."   [*Doc. 13-3* at 19].   Beyond it being "obvious," the ALJ did not explain his dismissiveness of a treating physician's medical opinion, although such opinions are, as a general rule, entitled to "controlling weight."   *See* 20 C.F.R. § 404.1527(c)(2).

Here, however, both the ALJ and his expert consultant clearly used the date on which Plaintiff was first seen by Dr. Cruz-Hinson as the defining factor in determining when his mental impairments became both severe and disabling.   *See* [*Doc. 13-3* at 23; *Doc. 13-4* at 8-10].   In so concluding, the ALJ appears to have relied entirely on the testimony of Jack E. Bentham, M.Ed., Ph.D., a non-examining psychologist hired by the Administration.   [*Doc. 13-3* at 23; *Doc. 13-4* at 6].   *See also* [*Doc. 13-7* at 34-35 and 40].   Although Dr. Bentham did not submit a written opinion, he testified at the December Hearing that he had found "no medical treatment record from a psychiatrist or psychologist[15] adhering to [Plaintiff's alleged onset date of January 10, 2012]." [*Doc. 13-4* at 8-9].   To the ALJ's inquiry of "what's the earliest date you see anything supportive of that," Dr. Bentham responded by referring to Exhibits 16F (*Doc. 13-17* at 2-5) and 20F (*id*. at 16-63), and stating "that's where you have the major depressive disorder talked about by [Dr. Cruz-]Hinson, but that's 3/6/14," and indicated that he did not see anything earlier than that. [*Doc. 13-4* at 9-10].   The ALJ then pointed out that Dr. Cruz-Hinson's initial psychiatric evaluation had been on February 6, 2013, and Dr. Bentham responded, "then that would be by the same doctor.   So that would be a valid onset date."   *Id*. at 10.   When Plaintiff's counsel indicated that he had no questions for the witness, the ALJ dismissed Dr. Bentham, who queried, "[s]o, what's the onset date we're setting here?"   *Id*. at 10-11.   The ALJ responded "I haven't figured

---

[15] Plaintiff actually began receiving *treatment* for depression from Dr. Bynum, who is not a psychiatrist, beginning on October 17, 2012, when she prescribed sertraline.   [*Doc. 13-16* at 27].   He was *diagnosed* with PTSD and Major Depressive Disorder by psychiatrist Dr. Cruz -Hinson on February 6, 2013.   *Id*. at 20.   However, since severity of a disability is not determined by the date when it is first treated (*Grotendorst*, 370 F. App'x at 883), it follows that an even more stringent standard, consisting of the date of first treatment *by a psychiatrist*, would be considered an even less reliable indicator of disabling severity.

that out, but you attested to February 26 [sic], 2013 being a good date for you," to which Dr. Bentham replied, "[i]t is a good date for me."   *Id*. at 11.   Other than remarking that "we do have a definitive diagnosis from a treating psychiatrist" (*Doc. 13-4* at 9), in reference to the March 6, 2014 medical record memorializing Dr. Cruz-Hinson's diagnoses of depression and PTSD (*Doc. 13-17* at 21), that testimony represents Dr. Bentham's "opinion," in its entirety.   The ALJ's reliance on Dr. Bentham's testimony in determining onset date is simply not warranted by either the facts or the law.

In the decision, the ALJ states that Dr. Bentham "testified that he had an opportunity to consider all of the medical evidence and stated that he had considered the medical source statement in [*Doc. 13-17* at 2-5], but found that the diagnoses and restrictions identified therein were not supported by the objective medical findings until February 6, 2013."   [*Doc. 13-3* at 23].   This characterization significantly misrepresents Dr. Bentham's testimony.   Effectively, Dr. Bentham testified that, as far as he knew, the first time Plaintiff received treatment from a psychologist or psychiatrist for mental issues was on February 6, 2013.   [*Doc. 13-4* at 10].   In even reaching that conclusion, Dr. Bentham had to be directed by the ALJ, since he appeared to neither fully understand his role at the hearing, nor be at all familiar with the records he supposedly "reviewed." *Id*. at 8-9.   Logically, if the first date of mental health treatment defines the onset date of disability, there would be no need to consult with a medical expert regarding onset, since the ALJ should certainly be capable of determining that date on his own.

In this case, the ALJ not only failed to properly determine the onset date of Plaintiff's disability, he also failed to explain his "finding" that Plaintiff was presumptively disabled pursuant to Listing 12.06.   Dr. Cruz-Hinson was the only physician to assess Plaintiff's mental

impairments for listing-level severity, and she indicated that Plaintiff's impairments met the criteria for both Listing 12.06 and 12.04.   However, the ALJ not only failed to discuss medical opinions, he also did not explain why he determined Plaintiff was disabled under Listing 12.06. Instead, the ALJ accorded "significant weight" to Dr. Bentham's opinion that Dr. Bentham "agreed with the assessment of [Plaintiff]'s treating physician in finding [Plaintiff] 'markedly' limited in his ability to complete a normal workweek, and [to] sustain an ordinary routine without special supervision," but that those opinions "were not supported by the objective medical findings until February 6, 2013."   [*Doc. 13-3* at 23].   As already noted, this statement inaccurately describes Dr. Bentham's testimony.   In addition, the decision cites "Exhibit 17F"[16] as the basis for Dr. Bentham's onset date testimony.   *Id.*   However, Dr. Bentham only testified regarding Exhibits "16F" and "20F on page 9."[17]   [*Doc. 13-4* at 9].   The ALJ's statement that Dr. Bentham "agreed with the assessment of [Plaintiff]'s "treating physician" also appears to refer to Dr. Bynum, rather than Dr. Cruz-Hinson, since the marked limitations the ALJ indicates that Dr. Bentham agreed to most closely resemble those assessed by Dr. Bynum.[18]   *See* [*Doc. 13-3*

---

[16] Exhibit 17F (*Doc. 13-17* at 8-9) consists entirely of Dr. Bynum's March 14, 2014 assessment of Plaintiff's "ability to do work-related activities."

[17] Exhibit 16F consists of Dr. Cruz-Hinson's March 6, 2014 assessments of Plaintiff (*Doc. 13-17* at 3-6), and page 9 of Exhibit 20F is simply a record notation of those assessments (*id*. at 21).

[18] Dr. Bynum assessed Plaintiff with marked impairment in the following three "non-physical" work-related activities:   (1) "Maintain physical effort for long periods without a need to decrease activity or pace, or to rest intermittently (i.e. 2-hour segments)"; (2) "Sustain an ordinary routine without special supervision"; and (3) "Complete a normal workday and workweek without interruptions from pain or fatigue based symptoms and to perform at a consistent pace without unreasonable number and length of rest periods."   [*Doc. 13-17* at 9].   Although the ALJ summarized the second and third of those findings, he did not mention the first.   [*Doc. 13-3* at 23].   At

at 23; *Doc. 13-17* at 9].   Significantly, Dr. Bentham neither agreed nor disagreed with any particular assessments made by Plaintiff's treating physicians.   Instead, he simply declared that the date on which Dr. Cruz-Hinson initially diagnosed Plaintiff's mental disorders was "a valid onset date" for Plaintiff's disability.[19]   [*Doc. 13-4* at 10].   That testimony falls well short of the "substantial evidence" that is required to support the ALJ's finding that Plaintiff "became disabled" on February 6, 2013.[20]   *Langley*, 373 F.3d at 1118 (a "mere scintilla of evidence" is not "substantial evidence") (citation omitted).

An ALJ has a duty to discuss the evidence and to explain his findings regarding listing-level severity.   *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996) (citing 42 U.S.C. § 405(b)(1)).[21]   When an ALJ fails to follow this mandate, his step three determination is simply

---

approximately the same time, Dr. Cruz-Hinson assessed Plaintiff with more and different marked impairments than did either Dr. Bynum or the ALJ.   [*Doc. 13-17* at 3-6].

[19] Dr. Bentham's testimony was that there was "a definitive diagnosis [of PTSD and depression] from a treating psychiatrist," and that the date of that doctor's initial evaluation "would be a valid onset date."   [Doc. 13-4 at 9-10].

[20] In the ALJ's view, Plaintiff's disability both began and reached listing-level severity on the same date.   However, with respect to slowly progressing disabilities such as Plaintiff's, it is extremely unlikely that both of those events would occur simultaneously.   *See* SSR 83-20 at *2.

[21] Section 405(b)(1) provides, in pertinent part, that "[t]he Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under this subchapter. Any such decision by the Commissioner of Social Security which involves a determination of disability *and which is in whole or in part unfavorable to such individual shall contain* a statement of the case, in understandable language, setting forth *a discussion of the evidence, and stating the Commissioner's determination and the reason or reasons upon which it is based.*"   Section 405(b)(1) (emphasis added).   In this case, the ALJ found Plaintiff disabled pursuant to the criteria of Listing 12.06, which is certainly a favorable result for Plaintiff.   However, limiting disability to more than a year beyond when Plaintiff alleged himself to be disabled is just as clearly a determination that is "in part unfavorable" to him.   Therefore, this statute is applicable to Plaintiff's claim.

19

"a bare conclusion [that] is beyond meaningful judicial review."[22]   *Id.   See also Brown v. Comm'r of Soc. Sec. Admin.*, 245 F. Supp. 2d 1175, 1184–85 (D. Kan. 2003) ("[T]he ALJ shall set out his specific findings and his reasons for accepting or rejecting the evidence regarding whether Plaintiff's impairments meet or equal [the relevant] listings").   The ALJ's finding that Plaintiff's mental impairments satisfied the criteria of Listing 12.06, as of February 6, 2013, is just such a "bare conclusion" that precludes its meaningful review.

Moreover, a reviewing court must also consider "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met."   *Grogan*, 399 F.3d at 1262.   The record in this case does contain evidence that appears to conflict with the ALJ's "established onset date."   For example, Dr. Cruz-Hinson's initial evaluation of Plaintiff specifically indicates that Plaintiff was depressed enough to plan a suicide in 2010 (*Doc. 13-16* at 16), and had reported "feeling depressed for a while," noting immediately thereafter that he had divorced three years prior to their first meeting; lives with his sister, which was a strain; lost his job and his truck; and "feels like he lost everything" (*id*. at 15).   Thus, according to Dr. Cruz-Hinson's notes, Plaintiff began suffering from symptoms of depression at least three

---

[22] Several years after the *Clifton* decision was issued, the Tenth Circuit clarified that "*Clifton* did not categorically reject the application of harmless error analysis" to the ALJ's step three conclusion.   *Fischer-Ross v. Barnhart*, 431 F.3d 729, 733 (10th Cir. 2005).   Thus, where "confirmed or unchallenged findings made elsewhere in the ALJ's decision confirm the step three determination," and the reviewing court can "confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way," *Clifton* would not require remand.   *Id*.   In this case, the ALJ did at least discuss his rationale for finding that Plaintiff was not disabled by physical impairments in connection with his determination of Plaintiff's pre-February 6, 2012 RFC.   However, the ALJ's physical findings have not been challenged here by Plaintiff.   Nonetheless, the *Fischer-Ross* "harmless error" analysis does not apply in this case because there are no findings regarding Plaintiff's mental impairments anywhere in the ALJ's decision that would allow for meaningful review of the ALJ's decision.

years prior to Dr. Cruz-Hinson's initial evaluation of him.   Dr. Cruz-Hinson also disclosed that

the trauma underlying Plaintiff's PTSD was suffered both in childhood and during Plaintiff's time

in the military, from 1968 to 1970.   *Id*. at 16, 18.   As such, Dr. Cruz-Hinson specifically

diagnosed Plaintiff with "PTSD military/childhood."   *Id*. at 20.   These statements do not support

the ALJ's determination that Plaintiff's mental impairments became both severe and disabling on

the day the records were made.

Additionally, while it was Plaintiff's depression that led Dr. Bynum to refer Plaintiff to

Dr. Cruz-Hinson for psychiatric treatment (*id*. at 23), Dr. Cruz-Hinson diagnosed Plaintiff with

both depression and PTSD (*id*. at 20).   The ALJ found that "[b]eginning on the established onset

date of disability, February 6, 2013," Plaintiff had "severe impairments" that included "PTSD, and

an affective disorder."   [*Doc. 13-3* at 18].   The ALJ did not discuss Plaintiff's depression either

with respect to Listing 12.04 or as it may have affected the severity or onset of PTSD.   However,

while "PTSD confers significant psychiatric disturbance, functional impairment, and morbidity as

a singular diagnosis, depression and PTSD commonly co-occur.   Research suggests, for example,

that significant depressive symptomatology affects between 30% and 50% of persons diagnosed

with PTSD."[23]   "Compared to those with depression alone, depressed patients with posttraumatic

---

[23] Duncan G. Campbell, Ph.D., et al., "Prevalence of Depression–PTSD Comorbidity: Implications for Clinical Practice Guidelines and Primary Care-Based Interventions, J. of Gen. Internal Med. 22.6: 711 (2007) (citations omitted).    Available at   https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2219856/   (site last visited January 4, 2017).

stress disorder (PTSD) experience more severe psychiatric symptomatology and factors that complicate treatment."[24]

Nonetheless, despite finding that Plaintiff has two mental impairments, the ALJ engaged in no genuine analysis of either of those impairments, nor did he consider the effects on Plaintiff of having both impairments together.   The ALJ most definitely did not give a "convincing rationale" for his determination of onset date, as is required by SSR 83-20.   Rather, it appears that the ALJ simply accepted Dr. Cruz-Hinson's diagnosis of PTSD (*Doc. 13-16* at 20), and then arbitrarily determined that the disability onset date of that disorder was the date on which Plaintiff was initially diagnosed.   In choosing the onset date, the ALJ also completely ignored indications by the diagnosing physician that Plaintiff's mental impairments arose from events that significantly preceded their diagnoses.   *See id*. at 15-21.   The ALJ provided neither a legal nor a factual basis for the onset date and, instead, merely asserted that the date had been determined by Dr. Bentham. [*Doc. 13-3* at 23].   Even if Dr. Bentham did determine the onset date, he did so based on principles that are not legally sound.   In sum, the determination of disability onset in this case precludes informed review by this Court and, therefore, requires reversal and remand for further consideration of Plaintiff's impairments and an analysis of the onset of his disability.

---

[24] *Id.*

### B.   The ALJ's Consideration of the Third-Party Statement

"The impact of lay evidence on the decision of onset will be limited to the degree it is not contrary to the medical evidence of record."   SSR 83-20 at *3.   Plaintiff contends that the ALJ "impermissibly ignored" the sworn statement of his sister, Wanda Morgan (*Doc. 13-10* at 25), noting that the ALJ "did not mention the third party statements when evaluating the credibility of [Plaintiff]'s complaints."   [*Doc. 18* at 15].   Defendant argues that SSR 06-3p only requires an ALJ to consider "other source" opinions "when such opinions may have an effect on the outcome of the case."   [*Doc. 24* at 12] (quoting SSR 06-3p at *6).   Plaintiff and Defendant each offer their own interpretation of the time frame to which Ms. Morgan refers in her statement.   Defendant claims that "Ms. Morgan's opinion described Plaintiff's functional limitations as of July 2014, or near that time," and as such, the statement "bears no significance on the issue of whether Plaintiff was disabled prior to February 2013."   *Id*. at 11-12.   Plaintiff responds that Defendant's interpretation is contradicted by Ms. Morgan's own statement, in which she said that "Rixey is my brother so I have known him for his entire life.   Rixey has lived with me for the past 4 years and I see him every day."   [*Doc. 28* at 4].

Unfortunately, both of these arguments miss the mark.   In her statement, Ms. Morgan describes Plaintiff's difficulties with his memory and, to a limited extent, his anxiety when she is not at home.   [*Doc. 13-10* at 25].   Ms. Morgan also discusses the physical effects that Plaintiff's heart attack and "stroke" have had on him.   *Id*.   What she simply does not discuss, however, is *when* Plaintiff's disabling mental impairments began.   It does not matter whether Ms. Morgan was discussing Plaintiff's condition during their entire relationship, over the last four years, or simply in 2014, because nothing in her statement is tied to a specific time period and, more

importantly, she did not address the progression of Plaintiff's mental symptoms.   In fact, Ms. Morgan only briefly alluded to Plaintiff's anxiety at all, as she discussed primarily his memory and physical issues instead.   *Id.*   The ALJ found that Plaintiff's physical impairments were not alone disabling (*Doc. 13-3* at 18), which is a determination that Plaintiff has not addressed in this appeal.   Therefore, this Court finds Plaintiff's claim that the sworn statement of Ms. Morgan supports an earlier disability onset date to be without merit.

## VI.   Conclusion

For the reasons stated above, the Court **FINDS** that the Commissioner's decision should be remanded for further proceedings, including a discussion of the ALJ's rationale for his findings, and a proper medical evaluation of onset date.

**IT IS THEREFORE ORDERED** that Plaintiff's *Motion to Reverse and Remand to Agency for Rehearing, with Supporting Memorandum* *(Doc. 18),* is **GRANTED** and the Commissioner's decision in this case is **REMANDED** to the Commissioner for further proceedings consistent with this Memorandum Opinion and Order**.**   A final order will be entered concurrently with this Memorandum Opinion and Order.

**IT IS SO ORDERED.**

*Lourdes a. Martinez*

**LOURDES A. MARTÍNEZ**
**UNITED STATES MAGISTRATE JUDGE**
**Presiding by Consent**